**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**July 2, 2024**

# In the Court of Appeals of Georgia

A23A0279. CALHOUN v. HARRELL.

BARNES, Presiding Judge.

Marion D. Calhoun appeals from a Stalking Three Year Protective Order entered against her and in favor of Carlotta Harrell. Calhoun contends that her conduct at issue – posting to Facebook comments relating to Harrell, the Chair of the Henry County Board of Commissioners – amounted to engaging in constitutionally protected political speech and was, at any rate, insufficient to authorize the order.[1] Because we find merit in Calhoun's argument that the evidence was insufficient, we reverse.

---

[1] Calhoun appealed to this Court, and we transferred the case to our Supreme Court on the basis that Calhoun's arguments raised a constitutional question within that Court's exclusive appellate jurisdiction. The Supreme Court transferred the case back to this Court, determining that this case does not fall within that scope.

As background, it is undisputed that Harrell procured in 2021 a one-year stalking protective order against Calhoun.[2] The record shows that the following year, in May 2022, Harrell returned to court and filed, expressly pursuant to OCGA § 16-5-94[3] and 19-13-4,[4] the petition that led to the now contested three-year protective order. In support of that petition, Harrell swore, "Calhoun has continued to make posting[s] on social media that have an undertone of violence. . . . I continue to be in constant fear of my life and safety because of the constant stalking of Ms. Calhoun via social media."

---

[2] The one-year protective order has not been made a part of the appellate record.

[3] OCGA § 16-5-94 provides that "[a] person who is not a minor who alleges stalking by another person may seek a restraining order by filing a petition alleging conduct constituting stalking as defined in Code Section 16-5-90." OCGA § 16-5-94 (a). The statute provides further that "[t]he court may grant a protective order . . . to bring about a cessation of conduct constituting stalking." OCGA § 16-5-94 (d).

[4] OCGA § 19-13-4 provides for the granting of protective orders "to bring about a cessation of acts of family violence." OCGA § 19-13-4 (a). While there was no allegation nor any evidence that Calhoun and Harrell were members of the same family, OCGA § 16-5-94 (e) states that designated subsections of "19-13-4 . . . relating to family violence petitions, shall apply to petitions filed pursuant to this Code section[.]"

On June 27, 2022, the trial court convened a hearing. The judge delineated from the bench that she was specifically interested in "what's happened between [the time the one-year protective order had issued] and now."

Harrell began her case by calling Calhoun to the stand. During such cross-examination, Calhoun described herself as a Black community activist; and she admitted that she had posted to Facebook a series of comments about Harrell, who is also Black. In response to various questions, Calhoun admitted that in a February 2022 post, she called Harrell and another individual "snakes";[5] that in a different February 2022 post, she called Harrell and another individual "MFERS" who had

---

[5] The exhibit associated with this testimony showed that Calhoun's post included:

> A real community activist makes noise in their community MOST OF THE TIME WHILE STANDING ALONE. I'M THAT BLACK QUEEN. . . I have a right to my voice my opinion and the right to speak freely about issues that concern me and my community. Henry County Georgia our government is being monopolize for a few black democrats aiding and abetting white folks to suppress our votes and our forward progress.

With photographs apparently depicting Harrell and other individuals, Calhoun's Facebook post continued: "THESE 2 SMILING BLACK FACES TELL LIES, THEY ARE WORKING TO SUPPRESS OUR VOTES WITH A REPUBLICON JUST SO THEY CAN STAY IN POWER. They are willing to have me jailed on false stalking charges becuz I'm exposing them for SNAKES that are. They know where I live, come get me, im not running nor hiding."

come from "traitorous ancestors";[6] that in another February 2022 post, she talked about Harrell's "blood line";[7] that in other February 2022 posts, she commented about Black politicians in Henry County;[8] that in a March 2022 post, she referred to Harrell's father as "just another dam pimp in the pulpit"; that in a March 2022 post, she said that Black politicians in the county could come get her because they knew

---

[6] The associated exhibit showed that Calhoun's post included: "[Both Harrell and another identified politician] are crooked manipulative lying evil selfish garbage that reap with stinch. . . In my opinion, the both of you come from a long line of traitorous ancestors . . . WHAT A DAM BLOOD LINE."

[7] The associated exhibit showed that Calhoun wrote in her post: "The Chairwoman of Henry County Ga is a DAM FOOL! Black History is the perfect time to reflect up those black folks like her from the beginning of slavery who had no dam problem selling other black into slavery, guess her bloodline is generational[.]"

[8] The associated exhibit showed that Calhoun posted commentary that "[a named state senator] and Henry County Chairwoman Harrell are underwriting the guidelines to suppress the black votes for their own selfish gain" and that "[t]his is what I got to say about some of our black politicians in Henry County, Ga. . . if you want to accuse me of stalking your ass, come get me, you know where I am . . . our votes are not only being suppressed by white politicians but also by black politicians as well and that's a dam shame. . . Many of our elected leaders or church leaders won't speak out about this corruption and voter suppression but I will[.]"

where she was;[9] that in an April 2022 post, she said that Harrell was a "skunk";[10] that in another post, she described Harrell as a "piece of crap";[11] that in other posts between August 2021 and April 2022, she characterized Harrell's mode as "fetching and stepping,"[12] "skinning and grinning,"[13] and being a "house Negro."[14] When

[9] The associated exhibit showed that Calhoun wrote, in part: ". . . so if the chairwoman of Henry County of any of these other corrupt politicians want to try and jail me or worse . . . you know where I am, I live, breath and talk in plain sight."

[10] The associated exhibit showed that Calhoun's post included commentary that "[several individuals] and Chairwoman Carlotta Harrell run together like a pack of infectous skunks, they all smell of corruption[.]"

[11] The associated exhibit showed that Calhoun wrote that a certain judge, a "Republican . . . whom I believe is an unfair judge, sent me a gleefully robo text endorsement he got from Carlotta Harrell, who I believe is a lying manipulative piece of crap who happens to be the chair person of Henry County and a Democrat in name only[.]"

[12] The associated exhibit showed that Calhoun wrote, in part, that "[a certain judge], a REPUBLICAN is running for reelection in Henry County in a non partisan race, so he doesn't have to state his party affiliation. . . . Below the chairwoman of Henry County and Democrat in name only endorsing this judge, for favors no doubt he has done for her in the past. . . . I can only imagine how many people came before him and the outcomes were not fair. White folks have a problem with teaching CRITICAL RACE THEORY BUT HAVE NO PROBLEM WITH BLACK FOLKS STILL PRACTICING THE 'FETCH AND STEP' to aid them." (This exhibit was accompanied by photographs.)

[13] The associated exhibit showed that Calhoun wrote, in part: "Carlotta Harrell has made sure minority representation is a bare minimum in Henry County government . . . case in point, she forced the black fire chief to resign so she can play

asked whether she had meant her name-calling as compliments, as fighting words, or as something else, Calhoun's response included: "[Harrell] knows why I wrote that. She's black."

When Harrell took the stand, she testified that she was the Chairman of the Board of Commissioners in Henry County, but had brought the action in her private capacity explaining that "[i]t's about my safety"; that she was afraid of Calhoun; and that she considered certain of Calhoun's name-calling to be fighting words and as "words of incitement" intended "to rile up the Black community to attack [her]." Harrell further testified that Calhoun's "going after [her] family" was something Calhoun had added since the previous protective order. When asked how she felt about Calhoun's posts collectively, Harrell responded,

> I feel threatened. I feel that my life is threatened. . . . And now . . . she's
> talking about my father who was a pastor of a church of 40 years. She

'footsies with the white RepubliCONS in Henry County['] . . . Here she stands 'skinning and grinning['] with the interim fire chief a white man she chose over all other minorities just as qualified. . . ." (Pictures accompanied this post.)

[14] The associated exhibit showed that Calhoun wrote, in part: "Chairwoman Harrell & [a specified state senator] your roles in trying to make the Henry County Board of Commissioners white again MAKES THE BOTH OF YOU THE BIGGEST HOUSE NEGROES AND BIGGEST LOSERS[.]"

doesn't even know my father. . . . She knows nothing about me. She just seems to be a very angry person, and I consider her to be a threat to my life.

When Calhoun returned to the stand for direct examination, she testified, "I'm a community activist, and I say what the community needs to hear about corrupt politicians," and she pointed out that she had posted to Facebook her opinions about several other elected officials. Calhoun further testified, "That's what community activists do. I exercised my First Amendment right in strong terms, but it does not mean that I want to hurt [Harrell]." As she described herself, "I'm a good person who has chosen as her life work to be a voice of the people, a steward of government, and a good person in my community who is willing to help others in need[.]" Calhoun gave examples of programs she had started, including creating a softball league for girls, initiating programs to address drug addiction suffered by certain individuals, assisting with the start-up of a county drug court, and helping probationers such that imprisonment was "the last resort." She explained, "I'm very vocal because I'm very concerned about what happens to the people, and it has nothing to do with me wanting to hurt Carlotta Harrell, but it's about making the people understand that they have

rights[.]" She testified, "I must let the people know, and I'm not gonna always be Ms. Pretty Pretty about a word," but "I mean [Harrell] no harm whatsoever."

At the end of the hearing, the trial court announced its finding that Calhoun's use of certain language in the Facebook posts was in violation of the stalking statute, OCGA § 16-5-90.[15] Reciting from that statute, the court expounded:

> It says – and this is the Code Section on stalking – harassing and intimidating another person, and then it says, it means knowingly and willful course of conduct directed at a specific person which causes emotional distress by placing and such person in reasonable fear . . . . It's your language that is the problem here. I'm going to extend the restraining order. It doesn't mean to say that you can't say, Vote against [Harrell]. Run against her. That's fine. But when you start using that foul language, you've got a problem. That's where the problem lies, not in

---

[15] OCGA § 16-5-90 (a) (1) states that

A person commits the offense of stalking when he or she follows, places under surveillance, or contacts another person at or about a place or places without the consent of the other person for the purpose of harassing and intimidating the other person. . . . For the purposes of this article, the term "harassing and intimidating" means a knowing and willful course of conduct directed at a specific person which causes emotional distress by placing such person in reasonable fear for such person's safety or the safety of a member of his or her immediate family, by establishing a pattern of harassing and intimidating behavior, and which serves no legitimate purpose.

what you're trying to do. . . . You call them snakes. You call them just the vilest names I can think of, and you can't do that.

The court acknowledged to Calhoun that "[y]ou do a lot of good," but suggested, "You need to start being pretty pretty about words. Some of it comes from the recipient as a threat." Referring to one specific Facebook post,[16] the court said to Calhoun, "[W]hen you start talking about crooked, manipulative, lying, evil, selfish garbage, you've gone beyond the way you need to be. That's threatening. That violates the Code."

That same day, June 27, 2022, the contested Stalking Three Year Protective Order was entered.

In this appeal, Calhoun contends that the superior court abused its discretion in granting the protective order.[17] Calhoun concedes that she made the Facebook posts and that – as she puts it – "[her] criticisms were blunt, sometimes crude or insulting,

---

[16] See footnote 6, supra.

[17] See *Lewis v. Lewis*, 316 Ga. App. 67, 68 (728 SE2d 741) (2012) ("The grant or denial of a motion for a protective order lies within the sound discretion of the trial court, and its decision on such a motion will not be reversed absent an abuse of that discretion. An abuse of discretion occurs where a ruling is unsupported by any evidence of record or where that ruling misstates or misapplies the relevant law.") (citations and punctuation omitted).

and sometimes profane." However, she argues that the trial court erred by determining that the posts rose to the level of *stalking*, given the lack of a "direct communication from [her] solely to Ms. Harrell." As Calhoun claims, her Facebook posts were "about Harrell and her associates, but [were] directed to the public, and concern[ed] Ms. Harrell's conduct as a public figure." Calhoun thus characterizes her commentary as political and intended to influence public opinion and voters. She additionally contends that "[her] activism in the form of Facebook posts advocating for change in local politics is speech protected by the United States Constitution and the Georgia Constitution" and that she cannot "be silenced through the use of a Stalking Three Year Protective Order, as is made clear by OCGA § 16-5-92."[18]

1. We turn first to Calhoun's contention that the evidence was insufficient[19] because an element of stalking under OCGA § 16-5-90 was not established.

---

[18] OCGA 16-5-92 provides in full: "The provisions of Code Sections 16-5-90 and 16-5-91 shall not apply to persons engaged in activities protected by the Constitution of the United States or of this state or to persons or employees of such persons lawfully engaged in bona fide business activity or lawfully engaged in the practice of a profession."

[19] "In reviewing the sufficiency of the evidence, we construe the evidence in favor of the findings of the trier of fact." (Citation and punctuation omitted.) *Bodi v. Ryan*, 358 Ga. App. 267, 267 (855 SE2d 11) (2021).

"In order to obtain a protective order based on stalking, the petitioner must establish the elements of the offense by a preponderance of the evidence." *Pilcher v. Stribling*, 282 Ga. 166, 167 (647 SE2d 8) (2007). In pertinent part, the stalking statute provides, "A person commits the offense of stalking when he or she follows, places under surveillance, or contacts another person at or about a place or places without the consent of the other person for the purpose of harassing and intimidating the other person." OCGA § 16-5-90 (a) (1). Calhoun posits that there was no allegation nor any evidence that she either followed Harrell or placed her under surveillance.[20] And relying on *Chan v. Ellis*, 296 Ga. 838 (770 SE2d 851) (2015), Calhoun argues that the evidence failed to establish "contact" for purposes of the stalking statute.

We find merit in Calhoun's argument that in light of *Chan*, 296 Ga. 838, Harrell failed to adduce evidence sufficient to establish that Calhoun contacted her in a manner prohibited by the stalking statute. In *Chan*, the Supreme Court of Georgia explained,

---

[20] Harrell makes no claim on appeal that she alleged or evinced that Calhoun followed her or placed her under surveillance. And for reasons discussed below, we reject Harrell's arguments for an affirmance of the trial court's judgment.

11

For purposes of the [stalking] statute, one "contacts another person" when he [or she] "communicates with another person" through any medium, including an electronic medium. See OCGA § 16-5-90 (a) (1). See also *Johnson v. State*, 264 Ga. 590, 591 (1) (449 SE2d 94) (1994) (as used in OCGA § 16-5-90, "[t]o 'contact' is readily understood by people of ordinary intelligence as meaning 'to get in touch with; communicate with' " (citation and punctuation omitted)). Although one may "contact" another for the purposes of the statute by communicating with the other person through any medium, it nevertheless is essential that the communication be directed specifically *to* that other person, as opposed to a communication that is only directed generally to the public. Common and customary usage suggests as much, as does another provision of the stalking law, which defines "harassing and intimidating" in terms of "a knowing and willful course of conduct *directed at a specific person*." OCGA § 16-5-90 (a) (1) (emphasis supplied).

(Footnotes omitted; emphasis in original.) *Chan*, 296 Ga. at 839-840 (1). As *Chan* further explained, "That a communication is *about* a particular person does not mean necessarily that it is directed *to* that person." (Emphasis in original.) Id. 840 (2). For instance, *Chan* noted, "[a]n ordinary speaker of the English language typically would not say . . . that a popular author had 'contacted' or 'communicated with' the speaker simply because the speaker had read a book written by the author." Id. at 840 (1), n. 6.

Upon reviewing the evidence in *Chan*, our High Court described that the record showed that

> [the appellant] and others posted a lot of commentary to his website about [the appellee], but it fails for the most part to show that the commentary was directed specifically to [appellee] as opposed to the public. As written, most of the posts appear to speak to the public, not to [appellee] in particular, even if they are about [appellee]. And there is no evidence that [appellant] did anything to cause these posts to be delivered to [appellee] or otherwise brought to her attention, notwithstanding that [appellant] may have reasonably anticipated that [appellee] might come across the posts, just as any member of the Internet-using public might.

*Chen*, 296 Ga. at 841 (2). Holding that "[t]he publication of commentary directed only to the public generally does not amount to 'contact,' as that term is used in OCGA § 16-5-90 (a) (1)," *Chen* concluded that "[appellee] failed to prove that [appellant] 'contacted' her without her consent, and [that] the trial court erred when it concluded that [appellant] had stalked [appellee]." Id. at 842 (3).

Guided by *Chen*, this Court reached a similar conclusion in *Bodi v. Ryan*, 358 Ga. App. 267 (855 SE2d 11) (2021). In *Bodi*, the appellee procured a stalking protective order based upon the appellant's post on Snapchat's social media

platform.[21] Id. at 268. This Court noted that the appellant had called the appellee an obscene name and included on his social media post that he wished appellee would die. Id. at 270 (b). However, this Court found no evidence that the appellant had been surveilling or following the appellant, and no evidence that the appellant had either contacted appellee or sent her the social media post. Id. at 270 (a). Reciting *Chen*'s principle that "[t]he fact that [appellant] could have reasonably expected that [the appellant] might discover the posts is insufficient to establish 'contact' under the statute," id. at 270 (a), this Court ultimately concluded that the appellee "[did] not establish the necessary contact to rise to the level of stalking," id. at 269 (a), and that the trial court thus abused its discretion in granting the protective order. Id. at 271 (b).

In the instant case, Calhoun admittedly posted to Facebook commentary about Harrell (and associated individuals), but the record "fails for the most part to show

---

[21] The Snapchat post contained the following commentary (which also publicized the appellee's daughter's hospitalization):

> [F]--- you. Suck a fat-ass dick. Stupid ass bitch, you want to stalk my f---ing Snapchat story and keep your daughter in a mental hospital? Stalk this, you f---ing retarded bitch. You're going to die the worst way there is to die, and I am praying for it. F--- you, doing the most.

*Bodi*, 358 Ga. App. at 268.

that the commentary was directed specifically to [Harrell] as opposed to the public. As written, most of the posts appear to speak to the public, not to [Harrell] in particular, even if they are about [Harrell]." *Chen*, 296 Ga. at 841 (2). Moreover, the record does not show that "[Calhoun] did anything to cause [her] posts to be delivered to [Harrell] or otherwise brought to her attention, notwithstanding that [Calhoun] may have reasonably anticipated that [Harrell] might come across [her] posts, just as any member of the Internet-using public might." Id. As held by *Chen*, "[t]he publication of commentary directed only to the public generally does not amount to 'contact'" under the stalking statute. Id. "Although our standard of review is deferential, where, as here, there is [insufficient] evidence to support the [stalking] charge, and there is not an issue of witness credibility, we are constrained to reverse" the Stalking Three Year Protective Order. *Bodi*, 358 Ga. App. at 269. See *Chan*, 296 Ga. at 838-839 (reversing stalking protective order, where defendant's antagonistic social media posts about the victim did not "amount[] to the sort of 'contact' that is forbidden by OCGA § 16-5-90 (a) (1)").[22]

---

[22] See also *Pilcher*, 282 Ga. at 168 (concluding that the stalking protective order was not authorized, where the complained-of conduct – including appellant's verbal taunts of "cursing, threatening employees' jobs, and belittling employees' intelligence, personal life, weight, sexual inexperience or financial situation" – did not

Notably, Harrell makes no argument on appeal that the Facebook posts were sufficient under *Chen*. Instead, she points out that she procured in 2021 a one-year stalking protective order against Harrell, then relies on OCGA § 19-13-4 to assert that "[t]he law presumes that the previous order will be converted" to a three-year order.[23] See generally *Shadix v. Carroll County*, 274 Ga. 560, 565 (3) (c) (554 SE2d 465) (2001) (citing principle that an appellate court may affirm a judgment when "right for any reason, even if it is based upon erroneous reasoning").

But Harrell specifies no particular language in OCGA § 19-13-4 that she purports created a presumption; she identifies no case authority interpreting the

constitute stalking as defined in OCGA § 16-5-90 (a) (1)) (citation and punctuation omitted); *Marks v. State*, 306 Ga. App. 824, 825-826 (1) (703 SE2d 379) (2010) (concluding that the appellant's posting statements on the Internet about his ex-wife did not constitute contact prohibited by the probationary term of the aggravated stalking sentence, where there was no evidence that he authored the web postings to get in touch with or communicate with his ex-wife); *Collins v. Bazan*, 256 Ga. App. 164, 165 (2) (568 SE2d 72) (2002) (concluding that "[p]ublishing or discussing a person's medical condition with others . . . does not constitute following, placing under surveillance, or contacting that person" as contemplated by the stalking definition set forth in OCGA § 16-5-90). Accord *Seibert v. State*, 321 Ga. App. 243, 244-245 (739 SE2d 91) (2013) (reversing aggravated stalking conviction, where there was insufficient evidence of contact).

[23] Notably, OCGA § 16-5-94 (e) states that "[t]he provisions of . . . subsections (b), (c), and (d) of Code Section 19-13-4, . . . relating to family violence petitions, shall apply to petitions filed pursuant to this Code section."

statute as such; and she puts forth no legal analysis in her brief that the statute contemplates any such presumption. See generally *Yash Solutions v. New York Global Consultants Corp.*, 352 Ga. App. 127, 137 (1) (b), n. 30 (834 SE2d 126) (2019) (noting principles that "[m]ere conclusory statements are not the type of meaningful argument contemplated by our rules" and that "cogent legal analysis. . . is, at a minimum, a discussion of the appropriate law as applied to the relevant facts") (citations and punctuation omitted); *Higgins v. State*, 251 Ga. App. 175, 178 (3), n. 3 (554 SE2d 212) (2001) ("An assertion of error followed by a case citation is not legal argument. As we have explained, legal analysis is, at a minimum, a discussion of the appropriate law as applied to the relevant facts.") (citation and punctuation omitted); Court of Appeals Rule 25 (b).

Moreover, we note that subsection (c) of the statute cited by Harrell provides:

Any order granted under this Code section shall remain in effect for up to one year; provided, however, that upon the motion of a petitioner and notice to the respondent and *after a hearing*, the court in *its discretion may* convert a temporary order granted under this Code section to an order effective for not more than three years or to a permanent order.

17

(Emphasis supplied.) OCGA § 19-13-4 (c). Here, the trial court conducted a hearing; Harrell did not claim entitlement to extended protection as a matter of any statutory presumption; rather, in support of her sworn allegation of "constant stalking of Ms. Calhoun via social media," Harrell presented at the hearing evidence of Calhoun's numerous Facebook postings; and as detailed above, the trial court granted a three-year stalking protective order based on an erroneous conclusion that Calhoun's social media commentary constituted stalking.

Given these circumstances, Harrell's newly asserted, unsupported position that "[t]he law presumes that the previous order will be converted" does not provide a basis for nevertheless affirming the judgment. See *Smith v. Laymon*, 279 Ga. 823, 824 (2) (620 SE2d 796) (2005) ("Issues never raised at trial will not be considered for the first time on appeal.") (citation and punctuation omitted); *Pfeiffer v. Ga. DOT*, 275 Ga. 827, 829 (2) (573 SE2d 389) (2002) (reciting that "[r]outinely, this Court refuses to review issues not raised in the trial court"); *CMGRP v. Gallant*, 343 Ga. App. 91, 94 (1) (806 SE2d 16) (2017) (reiterating that our right-for-any-reason rule may be invoked only when the issue was raised in the trial court and the opposing party had

a fair opportunity to respond); see also *Yash Solutions*, 352 Ga. App. at 137 (1) (b), n. 30; *Higgins*, 251 Ga. App. at 178 (3), n. 3; Court of Appeals Rule 25 (b).

2. Given our holding in Division 1, supra, it is not necessary to reach Calhoun's remaining (constitutional) challenge to the Stalking Three Year Protective Order. See *Herbert v. Jordan*, 348 Ga. App. 538, 539 (2) (823 SE2d 852) (2019) (reversing stalking protective orders on one ground and, thus, declining to address remaining challenges to such orders).

*Judgment reversed. Gobeil, J., concurs fully and specially. Pipkin, J., dissents.*

A23A0279.  CALHOUN v. HARRELL.

GOBEIL, Judge, concurring fully and specially.

While I concur fully with the result reached in this case, I write separately to note that our decision should not be read as implying that social media posts categorically cannot be used in violation of anti-stalking laws — or other laws for that matter (like incitement to an illegal act). In this case, Calhoun's words and actions — as offensive and understandably unsettling as they are — simply fail to rise to the level of "contact" for stalking given the holdings in *Chan* and *Bodi*.

A23A0279. CALHOUN v. HARRELL.

PIPKIN, Judge, dissenting.

Relying on *Chan v. Ellis*, 296 Ga. 838 (770 SE2d 851) (2015), the majority concludes that there was insufficient evidence that Calhoun "contacted" Harrell to satisfy OCGA § 16-5-90 (a) (1). However, when the evidence is viewed in the appropriate light, *Chan* is distinguishable from this case. Consequently, I would defer to the trial court's substantial discretion and affirm the determination that Calhoun did, in fact, repeatedly "contact" Harrell "for the purposes of harassing and intimidating" her. For these reasons, I must dissent.

In *Chan v. Ellis*, Matthew Chan's website had become a repository for criticism of a poet and her efforts to enforce the copyright on her work; the website featured "2,000 posts" about the poet, "some of which [were] distasteful and crude." *Chan*, 770 Ga. 838. The *Chan* Court explained, however, that, even where "a communication is *about* a particular person [that it ] does not mean necessarily that it is directed *to* that person." Id. at 840 (2). And, the evidence in that case "fail[ed] for the most part to show that the commentary was directed specifically *to* [the poet] as opposed to the public." Id. at 841 (2).

The posts in this case, on the other hand, were not limited to someone's personal website; instead, Calhoun used *social media*, namely, Facebook to target Harrell. Consistent with the design of social media, a number of Calhoun's posts "tag" dozens of other Facebook users and utilize numerous "hashtags," both of which would be designed to enlarge the audience of her posts; it would be reasonable to infer that these tactics were *also* designed to reach Harrell, especially given that many of the posts are directed at Harrell and a number are written in the second person. Thus, construing the evidence in favor of the findings of the trier of fact, as we must, I disagree with the majority opinion that "the record does not show that Calhoun did anything to cause her posts to be delivered to Harrell or otherwise

brought to her attention." In fact, the record shows that Harrell's sister became aware of the posts and issued a response; Calhoun then quoted that response in a subsequent post and used it to continue her barrage of words toward Harrell.

While I recognize that we must be mindful of restricting speech, Calhoun's numerous posts are filled with grotesque racial attacks and unsubstantiated allegations of criminal conduct, which target both Harrell and her family. Further, the undisputed evidence established that Harrell feared for her safety and that she felt threatened by Calhoun. In light of the evidence presented to the trial court below, it is imperative that we abide by our well-established standard of review and uphold the trial court's sound exercise of its discretion.

Accordingly, I respectfully dissent.